1
2
3
4
5
6
7
8          **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   CURTUS VAUGH JACKSON, JR.,              No.  2:15-CV-1675-JAM-DMC-P

12                  Plaintiff,

13          v.                                <u>FINDINGS AND RECOMMENDATIONS</u>

14   M/ DATOR,

15                  Defendant.

16

17          Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to

18   42 U.S.C. § 1983 alleging Defendant, Dator, violated his eighth amendment right to medical care.

19   Pending before the Court is Defendant's motion for summary judgment (ECF No. 117) arguing

20   that Plaintiff failed to exhaust his administrative remedies, the undisputed facts demonstrate

21   Defendant was not deliberately indifferent to Plaintiff's serious medical needs, and Defendant

22   Dator is protected by qualifiedly immune.  For the reasons discussed below, this Court finds

23   Defendant is entitled to judgment in his favor as a matter of law.

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

# I. PLAINTIFF'S ALLEGATIONS

This action proceeds on Plaintiff's verified complaint against Defendant M. Dator. (ECF No. 1).[1] Plaintiff alleges that Defendant was deliberately indifferent to his medical needs when he failed to change Plaintiff's dressings, failed to treat Plaintiff's medical needs related to Plaintiff's shoulder "popping out", and failed to treat Plaintiff's withdrawal symptoms.

Specifically, Plaintiff alleges he requested a dressing change on December 21, 2014, from Defendant and Defendant declined to change Plaintiff's dressing because Defendant needed to check the doctor's orders.[2] Plaintiff asserts his bandage was bloody and pusy during this time, but he did not show it to Defendant nor did Defendant ask to look at it. On December 23, 2014, Plaintiff saw Dr. Horowitz who issued an order for Plaintiff to receive a dressing change in two days and twice a week until his follow up appointment with his orthopedic surgeon. Plaintiff alleges he then requested a dressing change from Defendant on December 23, 2014, and again Defendant declined to change Plaintiff's bandage. Plaintiff then filed a 7362 Health Care Services Request Form ("7362"), and on December 24, 2014, Defendant received the 7362. In response to Plaintiff's 7362, Defendant changed Plaintiff's dressing.

Plaintiff alleges he submitted a 7362 on January 3, 2015, and January 5, 2015, complaining of shoulder pain and that his shoulder had "popped out." Plaintiff contends Defendant refused to address these complaints for more than 48 hours because Plaintiff "complains too much."

Finally, Plaintiff alleges on June 24, 2015, Defendant refused to consult with the on-call doctor, treat his withdrawal symptoms, and timely respond to his 7362 requests related to his alleged withdrawals.

///

---

[1] The complaint names the following as defendants: (1) Carmelino L. Galang, (2) Nikolaj Wolfson, (3) David Smiley, (4) M. Dator, (5) Evalyn Horowitz, and (6) Sam Wong-Do. See ECF No. 1. Defendants Carmelino L. Galang, Nikolaj Wolfson, David Smiley, Evalyn Horowitz, and Sam Wong-Do were dismissed on April 25, 2018. See ECF No. 81 (District Judge order).

[2] In Plaintiff's opposition he indicates the actual date was December 22, 2014, though Plaintiff stated it was December 21, 2014, in his deposition. See ECF No. 121 at 4.

## II. THE PARTIES' EVIDENCE

**A.    Evidence Offered by Defendant**

Defendant argues the following facts are not in dispute:

1.      Plaintiff Curtis Jackson was incarcerated at Mule Creek State Prison (MCSP) from March 2013 to February 2015 and June 3, 2015 to September 2016. (Jackson Dep. 29:4-15, attached as Ex. F to Esquivel Decl.)

2.      Jackson was housed in the Administrative Segregation Unit (ASU) at MCSP from December 21, 2014 to February 5, 2015, and June 3, 2015 to December 18, 2015. (Jackson Dep. 29:21-30:3.)

3.      Defendant Dator was a Registered Nurse assigned to the ASU. (Dator Decl. ¶ 2.)

4.      On September 20, 2014, Jackson injured his right shoulder while playing football. He was diagnosed with a separated shoulder that required surgical repair. Over the course of the next three months, his right arm was in a mobility sling, and he received Morphine for his pain. (Jackson Dep. 52:14-22, 54:1-20.)

5.      On December 18, 2014, Jackson underwent right-shoulder surgery at San Joaquin General Hospital (SJGH). The surgeon did not issue an order setting out a dressing-change schedule for Jackson. Jackson continued to receive Morphine for his pain. (Medical Records at 1-5, attached as Ex. G to Esquivel Decl.; Jackson Dep. 56:11-15, 61:25-62:8.)

6.      At Jackson's deposition, he testified that on December 21, 2014, he requested a dressing change from Dator, and Dator informed Jackson that he would look for a doctor's order. Jackson testified that he told Dator that his bandage was bloody and had pus, but that he did not show Dator the condition of his bandage. Jackson further testified that after that brief interaction, Jackson had no further interaction with Dator that day. (Jackson Dep. 46:6-48:23, 66:20-67:10, 68:18-20.)

7. Jackson saw Dr. Horowitz on December 23, 2014. Jackson testified at his deposition that he informed her that the metal plate in his shoulder had "popped out." (Medical Records at 6; Jackson Dep. 68:21-24, 69:3-12.)

8.      Dr. Horowitz issued an order on December 23, 2014, for Jackson to receive a dressing change in two days then twice a week until his follow-up appointment with the orthopedic surgeon. (Medical Records at 7.)

9.      Jackson was unaware in December 2014 that Dr. Horowitz issued an order for dressing changes, and he has no knowledge whether Dator received that order. Dator has no recollection whether he received a copy of Dr. Horowitz's order in 2014. (Jackson Dep. 70:22-71:3, 72:14-18; Dator Decl. ¶¶ 26-28.)

10.      Jackson testified at his deposition that following his appointment with Dr. Horowitz on December 23, 2014, he had another

brief encounter with Dator where he requested a dressing change. Jackson testified that he told Dator that he had just seen the doctor and needed a dressing change. Jackson did not testify that he described the condition of the dressing or show it to Dator. Jackson asserted that Dator responded "all right," but did not change Jackson's dressing. (Jackson Dep. 69:13-70:9.)

11.     On December 24, 2014, Dator received a Health Care Services Request Form (7362) that Jackson submitted, requesting a dressing change for his right shoulder. (Dator Decl. ¶ 4; Medical Records at 8.)

12.     On December 24, 2014, Dator met with Jackson in response to the 7362 and Jackson's complaint that the bandage on his right shoulder was falling off. Dator removed the bandage, and noticed that there were Steri Strips over Jackson's surgical wound. The wound was dry, without signs of infection. Dator placed a clean dressing, secured it with tape, educated Jackson on looking for signs of infection, and noted that Jackson was receiving pain medication and was already scheduled for a follow-up appointment with his primary care provider. (Dator Decl. ¶ 5; Jackson Dep. 76:9-11; Medical Records at 9.)

13.     Dator did not wipe or clean the surgical site with a disinfectant or solution because it risked causing infection and the Steri Strips to prematurely fall off the incision. (Dator Decl. ¶¶ 6-7.)

14.     Jackson did not request dressing changes from Dator after December 24, 2014. Psych tech (referred to as "site techs" in Jackson's deposition) provided Jackson with clean bandages, and he changed the dressings himself. (Jackson Dep. 86:14-16, 87:8-88:5.)

15.     On December 30, 2014, Dator received a 7362 from Jackson, requesting that his pain medication be renewed before it expired. The next day, Dator received another 7362 that Jackson submitted, again complaining that his pain medication was due to expire in a few days. He also asserted that he was concerned about going through withdrawals. (Dator Decl. ¶ 8; Medical Records at 10-11.)

16.     On January 1, 2015, Dator saw Jackson in connection with his 7362s. He complained of right-shoulder pain. Dator examined him: his vital signs were normal; he walked with a steady gait; and his breathing was even and unlabored. Dator informed Jackson that his Morphine was due to expire on January 17, 2015, and that he was going to be tapered off of it. (Dator Decl. ¶ 9; Medical Records at 12.)

17.     On January 5, 2015, Dator received two 7362s from Jackson, complaining that his right shoulder had "popped out," that it was not healing correctly, and that he was in a lot of pain. (Dator Decl. ¶ 10; Medical Records at 13-14.)

18.     On January 6, 2015, Jackson saw the orthopedic surgeon at SJGH, who informed Jackson that he needed to undergo another surgery on his right shoulder. The surgeon did not mention or state that Jackson's incision was infected. (Medical Records at 15; Jackson Dep. 92:16-19,

93:11-14.)

19.     On January 7, 2015, Dator met with Jackson to discuss his right shoulder pain and 7362s. Jackson informed Dator that he had seen the orthopedic surgeon the day before and had recommended revision surgery. Jackson was still receiving Morphine for his pain, and Dator confirmed that Jackson was already scheduled for a follow-up appointment with his primary care provider. (Dator Decl. ¶ 11; Medical Records at 16.)

20.     Jackson testified at his deposition that Dator delayed in processing his January 3 and 5, 2015, 7362s where he complained of shoulder pain and the plate "popping out." Jackson testified that Dator should have sent him, on January 5, 2015, to the prison hospital for higher level of care and that as a result of the delay, he had to endure pain and undergo multiple surgeries. (Jackson Dep. 103:10-106:1, 110:2-17.)

21.     On January 15, 2015, Jackson underwent a second surgery for his right-shoulder condition. The pathology report did not indicate any sign of infection. He was nevertheless prescribed antibiotics. (Medical Records at 17-20.)

22.     The next day, January 16, 2015, Jackson saw Dr. Horowitz. She noted that Jackson was on antibiotics and ordered that a nurse assess him for signs of infection on January 20 and 25, 2015. (Medical Records at 20-21.)

23.     On January 20, 2015, Dator saw Jackson to evaluate him for symptoms of an infection as Dr. Horowitz ordered. Dator examined Jackson's surgical site, noted that he had Steri Strips on the incision, and the dressing had dry blood on it. There was no redness, drainage, or other indicators of infection. Jackson's vital signs were normal. Dator placed a clean bandage on the wound and educated Jackson about looking out for signs of infection and to keep the dressing dry and intact. (Dator Decl. ¶ 12; Medical Records at 23.)

24.     Jackson saw Dr. Horowitz on January 23, 2015, where he complained that he felt that the plate in his shoulder was "popping out" again. The doctor noted that his incision had "healed well," and did not note any signs of infection. (Medical Records at 24.)

25.     On January 27, 2015, Dator saw Jackson for the second assessment ordered by Dr. Horowitz. Jackson's surgical site was clean and totally healed. Dator saw no abnormality, and Jackson's vital signs were within normal range. (Dator Decl. ¶ 13; Medical Records at 25.)

26.     On February 3, 2015, Dator received a 7362 from Jackson, complaining that the plate in his right shoulder was out of place and that he was in a lot of pain. Dator did not have an opportunity to meet with Jackson concerning this 7362 because Jackson was transferred to SJGH's emergency room on February 3, after he swallowed a metal object. (Dator Decl. ¶ 14; Medical Records at 26-27.)

27.     Jackson did not return to the ASU at MCSP until June 3, 2015. (Dator Decl. ¶ 14.)

28. On April 14, 2015, Jackson underwent a third surgery to repair his separated shoulder. The pathology report did not indicate the presence of an infection. (Medical Records at 28-30.)

29. Dr. Horowitz saw Jackson on June 6, 2015, to evaluate his shoulder condition and pain management. She ordered that he remain on Morphine for another ten days then be switched to Methadone. (Medical Records at 31-32.)

30. On June 20, 2015, Jackson submitted a 7362, complaining that he was experiencing severe withdrawal symptoms as a result of the change in his pain medication. Other medical staff members responded to Jackson's request. (Medical Records at 33.)

31. On June 22, 2015, Jackson submitted another 7362 concerning his withdrawal symptoms. (Medical Records at 34.)

32. Jackson saw a doctor on June 23, 2015, in connection with an inmate appeal he submitted and his 7362 dated June 20. The doctor's encounter note is silent on whether Jackson presented with withdrawal symptoms. (Medical Records at 33, 35.)

33. In the early morning of June 24, 2015, Dator received Jackson's June 22 7362. Dator met with Jackson at about 1:10 p.m. that day in response to the 7362. Jackson informed Dator that his pain medication was changed on June 18, and he was having "breakthrough" pain and withdrawal symptoms that included hot and cold sweats. Dator examined Jackson: his vital signs were within normal limits; he was walking with a steady gait; his speech was clear and coherent; his breathing was even and unlabored; and his skin was warm and dry. Jackson requested an increase in his Methadone dosage. (Dator Decl. ¶¶ 15-16; Medical Records at 36.)

34. Dator did not immediately refer Jackson to a doctor or for higher level of care because, despite Jackson's subjective complaints, he had no objective signs of withdrawal symptoms or that he was in substantial pain. Dator scheduled Jackson for a doctor's appointment to discuss his pain medication. (Dator Decl. ¶¶ 17-18; Medical Records at 36.)

35. At Jackson's deposition, he clarified that the hot and cold sweats, shakes, and stomach pain was caused by a reaction to his new pain medication, Cymbalta. He did not have withdrawal symptoms when his Morphine was changed to Methadone. By June 23, 2015, Jackson stopped taking the Cymbalta that was giving him these symptoms. (Jackson Dep. 114:5-115:23, 116:20- 25, 121:22-122:1.)

36. When Dator saw Jackson on June 24, 2015, his only symptom was pain. Jackson contends Dator's delay in responding to his 7362s and failure to send him to prison hospital caused him unnecessary pain. (Jackson Dep. 122:2-123:13, 125:24-126:25.)

37. On July 10, 2015, Jackson's Methadone prescription was

stopped, and he was prescribed Cymbalta for pain. (Medical Records at 38-39.)

38.     On the morning of July 20, 2015, Dator received and responded to Jackson's 7362, complaining of an adverse reaction to his pain medication. Although Dator referred Jackson for a routine appointment to see his primary care physician, Dator sent a message to Jackson's doctor informing her of Jackson's reaction to the new medication. Jackson's medication was discontinued the next day, and he was prescribed a different pain medication. (Dator Decl. ¶ 19; Medical Records at 40-42.)

39.     On July 29, 2015, Dator received a 7362 from Jackson, dated July 26, complaining of tingling and numbness in his right arm. He requested to see a neurologist. The next day Dator received another 7362 from Jackson, complaining of the same symptoms. (Dator Decl. ¶ 20; Medical Records at 43-44.)

40.     Dator met with Jackson on July 30, 2015, in connection with the two 7362s concerning the numbness and tingling sensation in his right arm. Dator examined him and noted that he was not in distress. His vital signs were normal, and his skin was warm and dry. Dator reviewed and discussed Jackson's pain medication with him, and noted that Jackson was already scheduled to see his primary care provider on August 7, 2015. (Dator Decl. ¶ 21; Medical Records at 45.)

41.     On August 27, 2015, Dator received and responded to Jackson's 7362 concerning his cancelled doctor's appointments, and his complaints of nerve pain in his right shoulder. Dator examined Jackson and noted that he was not in any distress and his vital signs were normal. Dator confirmed that Jackson was scheduled for an appointment with his primary care provider on September 1, and that he had an appointment with the orthopedic surgeon for October 1, 2015. (Dator's Decl. ¶ 22; Medical Records at 46-47.)

42.     Jackson did not have an infection following any of his surgeries from December 2014 to April 2015. It is standard post-surgical protocol to prescribe a short course of antibiotics after surgery to prevent wound infections. (Feinberg Decl. ¶¶ 9-18, 26; Dator Decl. ¶ 24.)

43.     Dator did not delay in responding to Jackson's 7362s dated January 3 and 5, 2015. Dator addressed the 7362s as soon as he could in light of his and Jackson's absence from the unit. Dator was aware Jackson had pain medication for his shoulder pain and had just seen the orthopedic surgeon. Jackson had no symptoms to warrant referral to a higher level of care on January 7, 2015. (Dator Decl. ¶ 30.)

44.     On June 24, 2015, when Jackson met with Dator, Jackson did not have any symptoms that would have given rise to a reasonable inference that he had severe withdrawal symptoms or a medical condition that required a higher level of care. (Feinberg Decl. ¶¶ 19-25, 27; Dator Decl. ¶ 31.)

45.     Between December 18, 2014 and August 6, 2015, Jackson submitted two health care appeals—Nos. MCSP HC 15046134 (6134) and

MCSP HC 15046403 (6403)—that were accepted for review. Both appeals were completed through the third level of review. (Gates Decl. ¶ 8, Ex. A-C.)

46. In appeal 6134, Jackson complained that his right-shoulder surgery was improperly done and that the ASU nurse refused to refer him to a doctor after he submitted a 7362 on January 3, 2015. (MCSP HC 15046134 at 3-6, 11, attached as Ex. B to Gates Decl.)

47. In appeal 6403, Jackson complained about the cancellation of his urgent orthopedic consultation and resulting delay in having surgery. He did not name Dator or refer to the ASU nurse in this appeal. (MCSP HC 15046403 at 3-8, attached as Ex. C to Gates Decl.)

48. Other than appeals 6134 and 6403, Jackson did not submit any other appeal concerning the issues raised in this lawsuit. (Jackson Dep. 145:11-15, 146:5-14.)

ECF No. 117-2 at 1-8.

Defendant's statement of undisputed facts is supported by the declarations of M. Dator (ECF No. 18), S. Gates (ECF No. 118-1), Bennett Feingerb (ECF No. 118-2), and Diana Esquivel (ECF No. 118-3) and the exhibits attached thereto—Exhibit A: California Correctional Health Care Services Appeal History for Jackson, Curtis; Exhibit B: California Correctional Health Care Services Appeals for Jackson, Curtis; Exhibit C: California Correctional Health Care Services Appeals for Jackson, Curtis; Exhibit D: Bennett Feinberg's Resume; Exhibit E: Curtis Jackson's medical records; Exhibit F: Deposition of Curtis Jackson; Exhibit G: Curtis Jackson's medical records; and Exhibit H: Curtis Jackson's response to interrogatories.

### B. Plaintiff's Evidence Offered in Opposition

Plaintiff filed the following in response to Defendant's motion for summary judgment:

ECF No. 121 "Plaintiff Opposing Brief to Defendant Dator Motion for Summary Judgment"

ECF No. 122 "Declaration in Opposition to Defendant's Motion for Summary Judgment"

ECF No. 123 "Statement of Disputed Facts"

/ / /

/ / /

8

In Plaintiff's Statement of Disputed Facts, Plaintiff alleges the following facts are in dispute:

1. September 20, 2014 I was diagnosed with possible shoulder dislocation by Dr. Rudas at triage & treatment. He order X-ray to take place September 22, 2014 and order morphine 15mg twice a day for 5 days with sling and ice order. By on call doctor. See Ex A

2. December 1, 2014 Dr. Wong discontinued 15mg of my pain medication before I had surgery. I was on morphine 30mg twice daily. See Ex. ECF.1 N-6 and Jackson Dep 54: 21-25, 55: 1-4.

3. On December 18, 2014 Jackson underwent reconstructive right shoulder surgery at SJGH. The surgeon did not issue an order or recommendation setting out a dressing change schedule for Jackson. Surgeon did recommend morphine 15mg and Keflex 500mg antibiotic and Dator refuse to summons an order from doctor at MCSP on call-doctor. Medical Records Ex. G-2 and Cal Code of Reg Title # 3354(c), see Admission # 11:13.

4. On 12-18-14 the medical return progress note is filled out a receiving and release and the nurse is responsible for prepare the form and completing it not a surgeon. See medical record Ex. E-5

5. On December 22, 2014 at deposition I testified I told Dator I need a dressing change it had been approx. 4 days after surgery. I could not get undress under an escort by officer I was fully clothed with a waist chain cuff. Dator never ask me to examine my wound or let custody know or come cell front to see my wound bloody and pus.

6. On December 23, 2014, Dr. Horowitz issued an order for Dator to do dressing changes. See Medical G-7. Dator claim he never received a copy but in Dator Decl 3, its responsibility to do dressing change. And I advised Dator after my interview Dr. Horowitz order dressing. Jackson Decl. 15 and Dep 69: 3-25.

7. Jackson saw Dr. Horowitz on January 23, 2015. Jackson testified that I informed her on December 23, 2014, but it was January 23, 2015 in which I seen her on both occasions the plate was popping off on 1-23-15. Eight days after second surgery. See medical record at G-24. Jackson Dep 99: 1-25.

8. Dr. Horowitz order dressing to be done by Dator in two day then twice a week until follow up appointment with orthopedic only bandage change I received by any medical staff and Dator at MCSP ASU was on December 24, 2014. I submitted a 7362 on December 28, 2014, December 30, 2014 was seen by Dator January 1, 2015. There's no documents or progress note of Dator stating he did a dressing change. Medical Record at 6-8, 9, 10, 11, 12, 13, 14. (Dep. 70:14-25, 86:20-25. Dep. 87-89).

9. Jackson did not testified of that he described condition of the dressing or show it to Dator because I had already discussed with Dator the dressing was falling off bloody and pus. Dep 47; Decl #7 Jackson.

9

10. Jackson Decl. 36. On January 5, 2015 Dator claim he received two 7362 from Jackson I submitted one of those 7362 January 3, 20145 that a psych tech hand delivered to Dator and he refuse to screen my or summons treatment at (TTA.) See Appeal MCSP HC-15046134. See medical records G-12/G-16 (Jackson Dep 99-101). The first time Dator screened Plaintiff was the January 7, 2015 refuse to summons treatment.

11. On January 15, 2015 pathologist report did indicate sign and symptoms of an infection in right shoulder. See medical records. Medical records Ex. G-18.

12. I was prescribe antibiotic on January 15, 2015 by Dr. Wong due to the infection in right shoulder. Medical Records G-18, Decl. 21.

13. On January 16, 2015 when I meant with Dr. Horowitz she noted I was already on antibiotic because after she denied me antibiotic to prevent an infection I still developed symptoms of an infection so to cover up liable it was mention but I was on givin antibiotic started 1-15-15. Ex G-21, 22, 23.

14. On February 3, 2015 at AM pill pass I submitted a 7362 to psych tech for them to deliver it straight to Dator. He received it on 2-3-15 sign for it. The reason was I need Dator to consult with on call doctor to adjust my pain medication because x-rays was taken at SJGH an it was discovered I need another surgery and my pain level was severe do to my morphine was being tapered down while I was reinjured. Dator refuse to summons me treatment so I was in so much pain and I waited all shift without Dator screening my 7362. I got emotional and tried to commit suicide. See medical at G-26. Jackson Decl 30.

15. Dr. Horowitz saw me on June 09, 2015 ask if my medication was alright I told her my current medication morphine 30mg three time a day was effective. Dr. Horowitz changed my pain medication for morphine 30mg T.I.D to methadone 5mg B.I.D and because I was on morphine for so long I began having withdrawal symptoms because I was not winged off or tapered down before starting a new medication. (See medical record at Ex. E-25, G-32).

16. Jackson saw a doctor on June 23, 2015 in connection with an inmate appeal he submitted on the cancelation of hospital follow up appointment that was scheduled for February 27, 2015 (See appeal Ex. C-1-12). This appeal was not connected to any 7362 dated June 20, 2015.

17. Dr. Soltanian was the interviewer who conducted inquiry into my appeal MCSP HC-15046403 Ex. C-1&12. I tried to let him know of my symptoms of withdrawals he did not want to discuss stating I'm here for 602 you have to submit a 7362. I advised him I've already done that.

18. After submitting two 7362 one on 6-20-15, another 6-22-15, Dator screened me for both. Dator never summon or consult with on call doctor I told him I was having break through pain and severe withdrawals do to not being winged off morphine. I was having hot cold

sweats stomach upset.  Dator sent me back to my cell without no treatment scheduling 2 week wait for PCP.  See Ex. E-29.

19.     I was trying to get prescribe methadone at noon like I was getting the morphine so the transition would stop the withdrawals.  See Ex. 29.

20.     On July 20, 2015 I was seen by Dr. Soltanian and he prescribe me Cymbalta for chronic and I was having a reaction to this medication after taking it a few times then I submitted a 7362 regarding this reaction that cause dizziness, upset stomach, vomiting, nausea.  So I start refusing that medication.  Dator claim he sent a message to my doctor.  But the next morning at AM pill call the psych tech tried to give me the same medication.  I told her I was having a reaction to the medication and right away she got the medication discontinued and Dr. Horowitz prescribe me Nortriptylline on July 21, 2015.  (See medical record Ex. G-39, G-42) Jackson Decl: 42.

21.     I submitted a 7362 regarding numbness and tingling in my right shoulder on July 26, 2015.  Dator claim he never received this 7362 request, when he refuse to screen my issues.  I submitted another 7362 on same issues.  Dator finally screen me on July 30, 2015 approx four days after complaining (according to nurse protocol production of documents # Ex. ASO581 ims vol. 4 chapter 4 access to primary care.)  Dator on several occasion violated procedure b refuse to screen me within 24 hrs if Dator deem my symptoms "routine."

22.     Jackson did develop an infection or symptoms of an infection following the first surgery December 18, 2014 according to medical records. Ex. G-18

23.     On December 13, 2016, San Joaquin surgeon examine an follow up for consultation and states after the first surgery my shoulder became infected and I underwent two more procedure after that.  Medical record Ex. H-1.  Jackson Dep. 83: 14-25, 83: 1-25, 84: 1-25, 85:1-25, Jackson Decl 21.

24.     On December 18, 2014 I was not prescribe any antibiotic to prevent infection. See medical record Ex. E-5, 6, G-4, 5.

25.     I was prescribed Keflex antibiotic after my second surgery January 15, 2015.  See medical records G-20, G-21.

26.     Bennett Feingerb MD, while I respect his opinion. He only give to opportunity to view and give opinion about the defendant.  He do not have personal knowledge or never examine me for himself.  He never offered an opinion about medical record.  EC. H-1, H-2, H-3.

27.     Dator did delay and deny to summons me medical treatment.  He received my 7362 both on January 5, 2015 I had serious medical need documented pain and plate popped up.  If he would screen me as emergent an sooner than January 7, 2015. Medical record.

28.     On June 19, 20, 22, 24, 2015 I had withdrawals symptoms.  Dator gave reasonable inference that I had severe withdrawal and delay

treatment.  Jackson Decl (32-40) Ex. K: 1-11 & L:2.

29.     Both my appeal # MCSP HC-1506134 and MCSP HC-15046403 accepted an reviewer.  Both was considered after 3rd level completion.  My administrative remedies are exhausted.  Ex. A-B-11, C-12 & N-1.

30.     In appeal 6134, I complained that my right shoulder was popped up and pain issue.  Ex B: 1-13

31.     In appeal 6403, I complained about cancel my appointment even though I did not name Dator MCSP reviewer Smith mispresentation of CA code of reg Tit. 15 He denied my action request to identify nurse responsible which had appeal process effectively unavailable.

32.     In appeal 6134 and 6403 and the interviewer all facts that was not known or name not known at the time I assert all facts contained or raised in this lawsuit.  See Ex. Decl. 1-6, Ex. Tit # 15 3084.2(3)

33.     MCSP had all level of my appeals to investigate my issues so any issue that was submitted on file in my GUHR on my shoulder surgery, 7362 consultation, Dr. Pain medication, order of antibiotic not seen after December 18, 2014 surgery.  One cursory dressing changes. Are document medical records the reviewer states in response to 602 my UHR unit health care records was reviewed.  See Ex. Appeal A-C-B.

ECF No. 123.

Plaintiff's statement of disputed facts cannot properly be labeled a statement of disputed material facts.  Many of the facts outlined above are the same as those in Defendant's statement of undisputed facts—meaning those facts are not actually in dispute (numbers 1, 16, 24, and 29).  Other facts are immaterial, irrelevant, misleading, unsupported, or in conflict with evidence in the record (numbers 2, 4, 7, 11, 17, 19, 20, 21, 22, 23, 24, 26, 28, 32, and 33) and others are undisputed in part (numbers 3, 8, 10, 12, 13, 14, 15, 18, 23, 29, and 31).  In fact, there is no stated "disputed fact," supported by any evidence in the record, that is truly in conflict with Defendant's statement of undisputed facts.

## III.  LEGAL STANDARD

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

standard for summary judgment and summary adjudication is the same.  See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

> Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  It is sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.

In resolving the summary judgment motion, the court examines the pleadings,

13

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251.

# IV. DISCUSSION

## A.    Failure to Exhaust Administrative Remedies

"The California prison grievance system has three levels of review; an inmate exhausts administrative remedies by obtaining a decision at each level." Reyes v. Smith, 810 F.3d 654, 657 (9th Cir. 2016) (citing Cal. Code Regs. tit. 15, § 3084.1(b) (2011), and Harvey v. Jordan, 605 F.3d 681, 683 (9th Cir. 2010)). See also Cal. Code Regs. tit. 15, § 3084.7(d)(3) ("The third level review constitutes the decision of the Secretary of the California Department of Corrections and Rehabilitation on an appeal, and shall be conducted by a designated representative under the supervision of the third level Appeals Chief or equivalent. The third level of review exhausts administrative remedies....").

Section 1997e(a) of the Prison Litigation Reform Act of 1995 ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

Prisoners are required to exhaust the available administrative remedies prior to filing suit. Jones v. Bock, 549 U.S. 199, 211 (2007); McKinney v. Carey, 311 F.3d 1198, 1199–

14

1201 (9th Cir. 2002) (per curiam).  The exhaustion requirement applies to all prisoner suits relating to prison life. Porter v. Nussle, 534 U.S. 516, 532 (2002).  Exhaustion is required regardless of the relief sought by the prisoner and regardless of the relief offered by the process, unless "the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint."  Booth v. Churner, 532 U.S. 731, 736, 741 (2001); Ross v. Blake, 136 S. Ct. 1850, 1857, 1859 (2016).

"Under the PLRA, a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.  The grievance need not include legal terminology or legal theories, because [t]he primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation.  The grievance process is only required to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued." Reyes, 810 F.3d at 659 (alteration in original) (citations and quotation marks omitted).

As discussed in Ross, 136 S. Ct. at 1862, there are no "special circumstances" exceptions to the exhaustion requirement.  The one significant qualifier is that "the remedies must indeed be 'available' to the prisoner." Id. at 1856. The Ross Court described this qualification as follows:

> [A]n administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. See 532 U.S., at 736, 738, 121 S.Ct. 1819....
> Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use....
> And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation....As all those courts have recognized, such interference with an inmate's pursuit of relief renders the administrative process unavailable.And then, once again, § 1997e(a) poses no bar.

> Id. at 1859–60.

"When prison officials improperly fail to process a prisoner's grievance, the prisoner is deemed to have exhausted available administrative remedies."  Andres v. Marshall, 867 F.3d 1076, 1079 (9th Cir. 2017).  If the Court concludes that Plaintiff has failed to exhaust,

15

the proper remedy is dismissal without prejudice of the portions of the complaint barred by § 1997e(a). <u>Jones</u>, 549 U.S. at 223–24; <u>Lira v. Herrera</u>, 427 F.3d 1164, 1175–76 (9th Cir. 2005).

In a summary judgment motion for failure to exhaust, the defendants have the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." <u>Albino II</u>, 747 F.3d at 1172. If the defendants carry that burden, "the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." <u>Id.</u> However, "the ultimate burden of proof remains with the defendant." <u>Id.</u> "If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." <u>Id.</u> at 1166.

Here, Defendant asserts Plaintiff filed two administrative appeals relevant to the facts in this case. First, appeal No. 6134, where Plaintiff asserted his right-shoulder surgery was improperly performed, Defendant refused to refer him to a doctor following a 7362 on January 3, 2015, and that medical staff, generally, provided him "inadequate medical care." ECF No. 118-1, Ex. B. Second, appeal No. 6403, where Plaintiff asserted the cancellation of his urgent orthopedic consultation and resulting delay in having surgery amounted to a violation of his rights. ECF. No. 118-1 Ex. C. Defendant argues Plaintiff never raised the issue of dressing changes or the issue of the denial of medical treatment related to Plaintiff's withdrawal symptoms. As such, Defendant asserts, the only exhausted claim is the claim related to Defendant's alleged deliberate indifference arising from Defendant's delay in referring Plaintiff to a doctor for his "popped out" shoulder and resulting shoulder pain.

Plaintiff argues during the first appeal interview (No. 6134) he provided additional factual details "like Dator failure to do withdrawals [and] dressing changes." ECF No. 121 at 8. Plaintiff asserts the administrative reviewer, Dr. Smith, neglected to include such information in the appeal and misrepresented information in the appeal. For this reason, Plaintiff argues the administrative remedy was made "unavailable" to him. This argument is unpersuasive.

In neither appeal does Plaintiff allege Defendant failed to change his dressings or that Defendant failed to treat his withdrawal symptoms. Though Plaintiff argues he raised these

16

issues during the interview process, there is absolutely no evidence to support this allegation. In none of Plaintiff's own filings does he mention such factual additions and none of the appeal documents reflect such factual additions. Further, there is absolutely no evidence that indicates any of the appeal officers misrepresented information. In fact, the only time this argument is raised is in Plaintiff's opposition to the motion for summary judgment (ECF NO. 121) where Plaintiff asserts, in a conclusory fashion, that Dr. Smith failed to include facts and misrepresented facts in the appeals process. As there is no support for such contention, this Court does not find Plaintiff's unsupported and conclusory argument persuasive. Consequently, Plaintiff has failed to exhaust his administrative remedies as to his Eighth Amendment claim related to dressing changes and withdrawal treatment. For that reason, these claims must be dismissed without prejudice.

However, because Defendant also asserts an argument on the merits, this Court will address the merits of each claim below.

**B.     Eighth Amendment Claim**

**1.     Legal Standard**

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment. See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976). Conditions of confinement may, however, be harsh and restrictive. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986). A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm. See Farmer, 511 U.S. at 834. Thus, to violate the Eighth Amendment, a prison

1    official must have a "sufficiently culpable mind." See id.

2         Deliberate indifference to a prisoner's serious illness or injury, or risks of serious

3    injury or illness, gives rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 105;

4    see also Farmer, 511 U.S. at 837. This applies to physical as well as dental and mental health

5    needs. See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982). An injury or illness is

6    sufficiently serious if the failure to treat a prisoner's condition could result in further significant

7    injury or the ". . . unnecessary and wanton infliction of pain." McGuckin v. Smith, 974 F.2d

8    1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).

9    Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition

10   is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily

11   activities; and (3) whether the condition is chronic and accompanied by substantial pain. See

12   Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

13        The requirement of deliberate indifference is less stringent in medical needs cases

14   than in other Eighth Amendment contexts because the responsibility to provide inmates with

15   medical care does not generally conflict with competing penological concerns. See McGuckin,

16   974 F.2d at 1060. Thus, deference need not be given to the judgment of prison officials as to

17   decisions concerning medical needs. See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.

18   1989). The complete denial of medical attention may constitute deliberate indifference. See

19   Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986). Delay in providing medical

20   treatment, or interference with medical treatment, may also constitute deliberate indifference. See

21   Lopez, 203 F.3d at 1131. Where delay is alleged, however, the prisoner must also demonstrate

22   that the delay led to further injury. See McGuckin, 974 F.2d at 1060.

23        Negligence in diagnosing or treating a medical condition does not, however, give

24   rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 106. Moreover, a

25   difference of opinion between the prisoner and medical providers concerning the appropriate

26   course of treatment does not give rise to an Eighth Amendment claim. See Jackson v. McIntosh,

27   90 F.3d 330, 332 (9th Cir. 1996).

28   / / /

18

## 2. Analysis

### a. Defendant's failure to Change Plaintiff's Dressing

Defendant argues the undisputed facts demonstrate that Defendant did not ignore any serious medical need Plaintiff had following his surgery. Specifically, Defendant argues the undisputed facts show that Plaintiff's requests for dressing changes never established a serious medical need and Defendant was never aware of any serious medical need related to the dressing change. Plaintiff argues, Defendant was deliberately indifferent by failing to change his dressing because such neglect rises to the level of deliberate indifference.

The evidence and undisputed facts in this case demonstrate that Defendant did not act with deliberate indifference to Plaintiff's medical need by failing to change his dressings. Plaintiff argues despite his bandage being bloody and pus filled, Defendant failed to change it on December 22, 2014. This fact is undisputed, and contrary to Plaintiff's argument, does not establish deliberate indifference. There is no evidence Defendant was aware that Plaintiff's bandage was in fact bloody and pus filled, as Defendant did not see any blood or pus on the bandage and no such blood or pus was shown to him by Plaintiff. The evidence further demonstrates Defendant was not aware of a serious medical need requiring him to change the bandage, because Plaintiff was not complaining of any severe symptoms and, as noted above, there were no visible indication the bandage needed to be changed. In addition, the evidence indicates Defendant believed he needed a doctor's order to change the bandage as post-surgical care is determined by the doctor. See ECF No. 118. This demonstrates that Defendant was acting within his role as a nurse, in refraining from changing the bandage, absent a showing of need or a doctor's order. As Defendant did not see a need for the bandage change and as there was no doctors order at this time, it cannot be said Defendant was deliberately indifferent. This is supported by the fact that at Plaintiff's doctor's appointment the following day, the doctor made no mention of his bandage being pus filled, bloody, or having any issues at all. ECF No. 118-3.

Further, Plaintiff's allegation that Defendant was deliberately indifferent in failing to change his dressing on December 23, 2014, the same day as Plaintiff's doctor's appointment, similarly fails. It is undisputed the doctor's December 23, 2014, order directed Plaintiff to have

19

his dressing "changed in two days and twice a week after that". ECF No. 117-2. It is further undisputed that Defendant was unaware of this order. However, the order did not require Plaintiff's dressing to be changed on December 23, 2014, so Defendant was not in violation of the doctor's order by declining to change the dressing on that day. Additionally, there is no evidence Plaintiff indicated he was in pain or otherwise suffering, which would give rise to a serious medical need, requiring Defendant to change the bandage. It is also undisputed Defendant changed Plaintiff's dressing the following day. For these reasons, there is no indication that Plaintiff was suffering from a severe medical need that Defendant was aware of, which could give rise to an Eighth Amendment violation. Because there is no evidence showing Plaintiff had a serious medical need and no evidence that Defendant was aware of a serious medical need, it cannot be said Defendant was deliberately indifferent. See Farmer, 511 U.S. at 834

Lastly, it is undisputed that Defendant did not change Plaintiff's dressing after this day. This is because Plaintiff received medical care from other medical staff, including Psych Techs who provided Plaintiff extra bandages, so he could perform his own dressing changes.

There is simply no evidence indicating any factual dispute that could support a finding of deliberate indifference. For that reason, as no material disputed facts exist, this Court finds Defendant is entitled to summary judgment on the claim related to changing Plaintiff's dressings.

> **b.**    **Defendant's failure to treat Plaintiff's medical needs related to Plaintiff's pain and shoulder "popping out."**

Plaintiff alleges on January 3, 2015, and January 5, 2015, Plaintiff submitted two 7362s complaining of shoulder pain and that his shoulder had "popped out." Plaintiff contends Defendant refused to address these complaints and requests for more than 48 hours because Plaintiff complains too much. This, Plaintiff argues, amounts to deliberate indifference. Defendant argues there is no evidence to support Plaintiff's claim that Defendant was deliberately indifferent by intentionally delaying review of Plaintiff's 7362s.

There is no dispute that Plaintiff filed a 7362 on January 3, 2015, and another on January 5, 2015. ECF No. 117-2. There is further no dispute that Defendant did not work on

January 3, 2015, or on January 4, 2015.  Id.  It is also undisputed that Defendant reviewed Plaintiff's 7362s on January 5, 2015, but did not see Plaintiff until January 7, 2015.  Id. Additionally, Plaintiff does not dispute he was out of the facility on January 6, 2015, for a medical appointment with the orthopedic surgeon.  Id.  Plaintiff argues the delay between the filing of his 7362s and his appointment with Defendant rises to the level of an Eighth Amendment violation.  Defendant argues he is entitled to summary judgment because there is no disputed material fact and the evidence indicates he did not act with deliberate indifference.  This Court agrees.

Neither 7362 indicated Plaintiff was faced with a severe medical need.  See ECF No. 118-3 at 40-41.  Though Plaintiff stated he was in pain, there was no reason to believe such pain required immediate medical attention, because Plaintiff did not provide any detail that would suggest immediate medical attention was necessary. See McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992).  There was simply no indication from the face of the 7362s that would have put Defendant on notice that Plaintiff required immediate medical attention.  For that reason, Defendant's practice of "triaging" the 7362s was reasonable, and it was reasonable to place Defendant's 7362s lower on the priority list.  There is no material fact in dispute here and no evidence that Defendant acted with deliberate indifference.  For that reason, Defendant is entitled to summary judgment on this claim.

### c. Defendant's failure to treat Plaintiff's withdrawal symptoms on June 24, 2015.

Defendant argues the medical evidence indicates Plaintiff did not have an objectively serious medical need on June 24, 2015.  Defendant argues because Plaintiff was not having withdrawal symptoms, had normal vital signs, even and unlabored breathing, clear and coherent speech, warm dry skin, and was currently taking a low dose pain medication, no serious medical need existed.  Defendant further argues to the extent Plaintiff attempts to create factual disputes in his opposition to summary judgment, this court should disregard those as they are unsupported by the evidence and contradicted by Plaintiff's deposition testimony.  Plaintiff argues there was sufficient information for Defendant to infer Plaintiff was suffering from a serious medical need.

The basic facts related to this claim are undisputed. Plaintiff filed a 7362 on June 20, 2015 and on June 22, 2015, related to withdrawal symptoms. ECF No. 117-2 and 122. On June 24, 2015, Plaintiff met with Defendant related to his complaint of withdrawal symptoms. Id. Defendant examined Plaintiff but did not refer Plaintiff to a doctor for a higher level of care. Id. This Plaintiff asserts amounts to an Eighth Amendment violation. This Court disagrees.

Though Plaintiff asserts in his Declaration that he began having withdrawal symptoms on June 19, 2015, this statement is in direct contradiction to Plaintiff's deposition testimony. Compare ECF No. 122 at 7 with Jackson Depo. 122:2-123:13, 125:24-126:25. For this reason, the Court affords little weight to Plaintiff's assertion that he was suffering from withdrawal symptoms. Based on the remaining evidence, it seems Defendant engaged in a substantive review of Plaintiff's physical condition, evaluated him based on valid medical practices, and determined no additional treatment was necessary. See ECF No. 117-2 and 118. Though, Plaintiff clearly disagrees with Defendant's conclusion that no additional treatment was necessary at that time, such a disagreement does not amount to an Eighth Amendment violation. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996). Further, there is no evidence that Plaintiff suffered any harm as a result from any alleged delay between when Plaintiff filed his 7362s and when he was seen by the Defendant. See McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992). All things considered, there are simply no true disputed facts related to this claim, and no evidence that could support a claim for deliberate indifference. As such, Defendant is entitled to summary judgment on this claim as well.

**C. Qualified Immunity**

Defendant argues even if he committed constitutional violations, he is entitled to qualified immunity. The defense of qualified immunity protects "government officials ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether the right was clearly established, such that it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted.  Pearson v. Callahan, 555 U.S. 223, 236 (2009); Saucier

v. Katz, 533 U.S. 194, 201 (2001).  The evidence must be viewed in the light most favorable to

the non-moving party.  Tolan v. Cotton, 134 S.Ct. 1861, 1866 (2014).

Because, this Court finds Defendant Dator is entitled to summary judgment on the

merits of the Eighth Amendment claims there is no reason to reach the qualified immunity issue

in this case.  Thus, this is not a case where qualified immunity need be determined.


## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that:

1.      Defendant's motions for summary judgment (ECF No. 117) be

GRANTED; and

4.      The Clerk of the Court be directed to enter judgment in favor of Defendant

and close this file.

These findings and recommendations are submitted to the United States District

Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

after being served with these findings and recommendations, any party may file written objections

with the court.  Responses to objections shall be filed within 14 days after service of objections.

Failure to file objections within the specified time may waive the right to appeal.  See Martinez v.

Ylst, 951 F.2d 1153 (9th Cir. 1991).


Dated:  September 4, 2019

_____
DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE